## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

BOWE BELL + HOWELL COMPANY,　　　*

　　　Plaintiff,　　　　　　　　　　*

　　　　　v.　　　　　　　　　　　*　　　CIVIL NO. RDB 04-3418

ALBERT M. HARRIS., et al.　　　　　*

　　　Defendants.　　　　　　　　　*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Plaintiff, the Bowe Bell + Howell Company ("BBH" or "Plaintiff" or "Company") has instituted this action against Albert Harris, Michael Brooks, Niels Andersen, Jeffrey Leutner, Richard Nestor, David Meehling, (collectively "Individual Defendants") and Document Services Inc. (d/b/a Trans-Print Software Services and Trans-Print Services) (collectively "Defendants") alleging federal copyright and trademark infringement and related state law claims arising out of the business practices of the Defendant corporation, Documents Services Inc. or Trans-Print  (hereinafter "Trans-Print") and the Individual Defendants, who are all associated with Trans-Print.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

Currently pending before this Court is a motion by BBH seeking a preliminary injunction against the Defendants to enjoin them from conducting business related to a software package called the TransFormer.  The parties have briefed this matter and the Court conducted a preliminary injunction hearing on November 10 and 12, 2004.  The parties submitted proposed findings of fact and

conclusions of law, as requested by the Court, in post-hearing submissions.  The Court having fully considered the parties' arguments and the evidence presented, and for the reasons stated herein, is GRANTING in part and DENYING in part Plaintiff's Motion for Preliminary Injunction.

BBH is entitled to preliminary injunctive relief enjoining: 1) Trans-Print, its agents, and Michael Brooks from reproducing, distributing, displaying, or creating derivatives of the BBH works protected by copyright; 2) all Defendants from performing software maintenance or other services concerning BBH's copyrighted TransFormer software; 3) all Defendants from retaining, using, disclosing, or otherwise misappropriating any of BBH's trade secrets or other confidential or proprietary information; 4) all Defendants from using BBH's TransFormer trademark; 5) all Defendants from soliciting or accepting business relating to the TransFormer software from any customer of BBH; 6) Defendant Niels Andersen from any employment with Trans-Print or any company that competes with BBH for a period of one year from August 5, 2004 to August 5, 2005; 7) Defendant Jeffrey Leutner from any employment with Trans-Print or any company that competes with BBH for a period of one year from September 30, 2004 to September 30, 2005; and 8) Defendant David Meehling from any employment with Trans-Print or any company that competes with BBH for a period of one year from October 15, 2004 to October 15, 2005.  The Court is denying BBH's request to provide preliminary injunction relief to enforce Nestor's covenant not to compete.

## BACKGROUND

This case concerns a software package called The TransFormer ("TransFormer"), which is a proprietary print-image and data manipulation software package used in large-scale mail processing.  This software provides users with the ability to enhance, reformat and redesign mailing data

for high-speed commercial printers. The software allows a business to utilize its existing database of customer and account information, manipulate that information, and present it in more desirable or different formats on bills and other communications.

BBH currently owns the TransFormer software, which it purchased from a company called The Harris Group ("THG") for $5 million in 1997. Defendants Harris and Brooks were shareholders in THG. Harris personally received approximately $2.5 million from the sale and Brooks received approximately $500,000. Harris acted as a consultant for BBH for approximately a year and a half after the sale of THG. Brooks joined BBH as an employee after the sale and worked at BBH until early August 2004 when he was terminated as part of a reduction in force. Immediately, Brooks filed articles of incorporation on August 12, 2004, incorporating Trans-Print as a Subchapter S corporation. Brooks became the principal shareholder of said corporation. Defendants Andersen, Leutner, Nestor, and Meehling are all former employees of BBH, who all currently are employed by Trans-Print.

Plaintiff filed the instant action on Friday October 22, 2004 alleging that the creation of Trans-Print is an effort to reconstitute a business that BBH purchased in 1997 when it bought THG. On that same day, Judge J. Frederick Motz of this Court conducted a hearing on BBH's request for a Temporary Restraining Order ("TRO"). At the conclusion of the hearing, Judge Motz initially granted BBH's request for a TRO, but reconsidered and withdrew his Order on Monday, October 25, 2004 during a telephone conference with the parties. The parties conducted expedited discovery on issues relating to Plaintiff's motion for a preliminary injunction.

<u>FINDINGS OF FACT</u>

1.    The TransFormer was developed by Defendants Harris and Brooks during the early 1990's.
The TransFormer was the main asset of THG, of which Harris was a founder and more than
50% shareholder.  Brooks owned approximately 10% of the stock of THG.  Defendants
Andersen, Leutner and Nestor worked for THG.  THG obtained a copyright to the
TransFormer software.

2.    In 1997, BBH purchased virtually all of the assets of THG for over $5 million.  This purchase
resulted in Harris personally receiving approximately $5 million and Brooks receiving
approximately $500,000.  THG's assets included: 1) the TransFormer software; 2) copyrights
and other intellectual property protecting the TransFormer software; and 3) the business of
providing software maintenance and professional service to licensees of the TransFormer
software.

3.    This sale is evidenced in agreements dated November 5, 1997.  In addition to purchasing the
THG assets listed above, BBH also purchases all of THG's "know-how" and "trade secrets."
(*See* Agreement For Purchase and Sale of Assets, Ex. 2 to Am. Compl.)

4.    The trade secrets associated with the TransFormer software include numerous proprietary
computer programs, source code, and statement parameter groups ("SPGs"), all of which are
only available by purchasing a license from BBH. (Victor Tolomei Dep. at 108:6-115:16.)

5.    As part of the sale of THG to BBH, Harris became a consultant for BBH for about a year and
a half after the sale and Brooks became a BBH employee.  Both Harris and Brooks signed
agreements prohibiting them from disclosing confidential information related to the TransFormer

4

software and the business of servicing the software for the benefit of any other person or entity other than BBH.

6.    BBH customers purchase a license to the TransFormer software, which includes related programs and a few training SPGs. To purchase this license, a customer pays a one time fee and signs a license agreement with BBH.

7.    BBH also offers customers what is called a Support and Maintenance Agreement ("SMA"). Under the SMA, which customers can choose to renew on an annual basis for a fee, customers receive, among other things, software upgrades, solutions that fix bugs in the TransFormer software, and SPGs written by BBH. Not all licensees of the TransFormer software choose to maintain an SMA. These self maintaining customers may have developed in-house knowledge on how to support the TransFormer software.

8.    In general, BBH's TransFormer licence agreement, which was filed under seal, provides that any and all copies or modifications to the TransFormer software are part of the licensed product. Licensees must only use the product for their sole and exclusive benefit. In addition, licensees are not allowed to let others use or have access to the TransFormer software without the prior written consent of BBH.

9.    Licensees generally receive the TransFormer object code, but some limited customers receive the TransFormer source code under special arrangements.

10.    Statement Parameter Groups or SPGs are necessary to customize the TransFormer product for licenced users. SPGs are instructions written for the TransFormer, which are created using a propriety programming language. In practice, a TransFormer licensee needs SPGs to be able

to use the product and, in turn, a user must have TransFormer software to use SPGs. When a licensee purchases the TransFormer software, certain sample SPGs are included with the software. The licensee is also permitted to create additional SPGs to meet its needs.

11.     In May of 2004, Defendant Brooks, while still employed by BBH, sent a 267 page BBH customer list to Harris. This list contains contact names, contact information, and service histories for hundreds of BBH customers. The customer list was saved on a password protected BBH server, that is securely stored in BBH's Baltimore office. As a result, only BBH employees could access this customer list. BBH provided some customer names and customer contact information to the public in the normal course of marketing its products and services. Otherwise, BBH did not make available to the public this list or the information on the list.

12.     Before deleting the list from his personal computer on October 23, 2004, Harris made some modifications to the list and renamed the file containing the customer list.

13.     Brooks continued to work for BBH until early August 2004, when he was terminated by BBH as a part of a reduction in force. Immediately, Brooks incorporated Trans-Print on August 12, 2004. Brooks is the principal owner of Trans-Print, which is classified as a Subchapter S corporation.

14.     A press release issued by Trans-Print on August 18, 2004 stated that Trans-Print "will initially offer third party contracted software maintenance and professional services support for the TransFormer™ software product." This press release also specifically referenced Defendant Harris. Trans-Print has successfully offered these services to approximately five TransFormer

6

licensees, who have signed license agreements with BBH.

15.    Although Harris is apparently not an employee of TransPrint, his name is in the August 18,

2004 Trans-Print press release, which states that "Albert M. Harris, the original developer and

owner of The Harris Group's printstream parsing software The TransFormer ™, announced

the formation of Trans-Print Software Services™ (TPS)."  Harris is quoted in the press release

as explaining "[w]e have the opportunity to fill a void left when licensed owners of The

TransFormer™ allowed their high priced maintenance contracts to expire, and underutilized

their software investment due to very high PSG [Programmer Services Group] fees."  The

press release also notes that "[j]oining Mr. Harris will be Michael Brooks . . . ."  This Trans-

Print press release used the trademarked name "TransFormer" eleven times.

16.    Andersen, Leutner, Nestor, and Meehling, all of whom previously worked for BBH, are

currently employed by Trans-Print.

17.    Andersen, Leutner, Nestor, and Meehling all signed employment agreements with BBH stating

that they would not compete with BBH for a year after a separation from the Company.

Although Brooks signed a non-compete with BBH when he joined the Company, the Plaintiff

does not contend that Brooks is currently covered by a non-compete agreement with BBH.

18.    On July 22, 2004, Nestor and Brooks were told that BBH would be terminating their

employment, effective in two weeks, on August 5, 2004.  Andersen was also told on this date

that he would be laid off, but his termination was reneged and the Company tried to convince

him to stay.  Nonetheless, Andersen decided to leave BBH on August 5, 2004.  Leutner left

BBH on September 30, 2004 and Meehling left BBH on October 15, 2004.

19.     Defendant Trans-Print, in the course of performing business for a BBH licensed customer, copied the TransFormer source code from the licensee under a non-disclosure agreement with that licensee.

20.     Defendants Andersen, Leutner, Nestor, and Meehling also had employment agreements with BBH prohibiting them from disclosing confidential information related to the TransFormer software and the business of servicing the software for the benefit of any other person or entity other than BBH.

21.     As part of Trans-Print's business, it has written and/or modified SPGs for its customers.

22.     On October 20, 2004, Plaintiff's counsel wrote a letter to the Defendants' counsel informing him of BBH's intention to initiate a lawsuit concerning the TransFormer software. In this letter, Plaintiff's counsel asked Defendants' counsel to remind his clients about their obligation to preserve documents, whether paper or electronic, that may be relevant to the subject of the pending lawsuit.

23.     On October 22, 2004, this lawsuit was filed and, the same day, this Court, pursuant to Judge Motz's oral order during the TRO hearing, instructed the Individual Defendants to provide their computers to Plaintiff's forensic computer expert for review. However, after the initiation of this lawsuit on Friday, October 22, 2004 and after the Court's Order, the Individual Defendants collectively deleted over 35,000 computer files before their computers were delivered to Plaintiff's forensic computer expert, CoreFacts, for analysis on Monday, October 25, 2004.

24.     Brooks testified that he believed that this Court, through Judge Motz's October 22, 2004

8

Order, had somehow instructed him to delete all BBH-related files from his computer prior to turning it over to CoreFacts.

25.     The Individual Defendants maintained personal information, such as information about personal finances, as well as proprietary Trans-Print customer information, on the computers that they were required to turn over to Plaintiff's expert, CoreFacts.

26.     After deleting files, the Individual Defendants ran what is called "wiping" software, such as Secure Delete and Kremlin, on their computers and also used the "de-frag" program in an effort to ensure that none of the deleted files could be recovered.

27.     Within two hours of one another, on October 23, 2004, Defendants Harris and Brooks ran the program Secure Delete on their computers.  On the same day, both used de-frag on their computers.  In addition, Nestor ran the Secure Delete program on his computer the next day and Andersen ran the wiping program known as Kremlin.

28.     Although it is impossible to determine precisely how many relevant files were destroyed, in large part because of the use of wiping software and the execution of the de-frag function, approximately 9,044 of the deleted files appeared to relate to the TransFormer software and/or BBH.

<u>CONCLUSIONS OF LAW</u>

Under Federal Rule of Civil Procedure 65, the decision whether to issue a preliminary injunction is committed to the sound discretion of the trial court.  *See Hughes Network Sys. v. InterDigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir. 1994).  "Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a

very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (internal quotation and citation omitted). In determining whether to grant a preliminary injunction the district court is forced to act on an incomplete record and order a party to act, or refrain from acting, in a certain way. *See Hughes Network Sys.*, 17 F.3d at 693. As a result, "the danger of a mistake" in this setting "is substantial." *See id.* (quoting *American Hosp. Supply Corp. v. Hospital Prods., Ltd.,* 780 F.2d 589, 593 (7th Cir. 1986)).

To determine whether a preliminary injunction is appropriate, the court must consider four factors established by the Fourth Circuit in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189 (4th Cir. 1977). These four factors are: 1) the likelihood of irreparable harm to the plaintiff if the injunctive relief is denied; 2) the likelihood of harm to the defendant if the requested relief is granted; 3) the likelihood that the plaintiff will succeed on the merits of the action, and 4) the public interest. *See also Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991); *Hughes Network Sys.*, 17 F.3d at 693 (citing *Blackwelder,* 550 F.2d at 193-95).

The Fourth Circuit has established what is known as the hardship balancing test and this test places special importance on the first two factors of the *Blackwelder* analysis. *See Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997) (citing *Direx,* 952 F.2d at 812). To conduct the hardship balancing test, the district court must weigh the first two factors regarding the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied and the harm to the defendant if granted. *See id.* The harm demonstrated by the plaintiff must be neither remote nor speculative, but actual and imminent. *See id.* Furthermore, harm is not "irreparable" if it can be compensated by money damages

10

during the normal course of litigation. *See Hughes Network Sys.,* 17 F.3d at 694.

After the district court has completed the hardship balancing test, the court can determine the degree that the plaintiff must demonstrate a likelihood of success on the merits. *Manning*, 119 F.3d at 263. There is a "sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa." *Sun Microsystems, Inc. v. Microsoft Corp.*, 333 F.3d 517, 526 (4th Cir. 2003); *see also Direx*, 952 F.2d at 812-13 (citing *Rum Creek Coal Sales, Inc.*, 926 F.2d at 359). Lastly, the district court must consider whether a preliminary injunction would be in the public interest.

I.    Hardship Balancing Test

A.    The Likelihood of Irreparable Harm to BBH if the Injunctive Relief is Denied

BBH has articulated facts showing that it would suffer irreparable harm in the absence of injunctive relief. First, BBH has shown that the Defendants have potentially infringed on its copyrighted software by copying the TransFormer source code to assist a customer. Second, BBH has also presented evidence that its registered trademark "TransFormer" was used eleven times in a Trans-Print press release. Plaintiff argues that the wrongful use of the its trademark will cause confusion in the marketplace. These types of harm are generally irreparable because they cannot be compensated by money damages during the normal course of litigation. *See MyWebGrocer, LLC v. Hometown Info., Inc.*, 375 F.3d 190, 192-93 (2d Cir. 2004) (determining that the irreparable harm prong of the preliminary injunction test was satisfied when a copyright plaintiff makes out a *prima facie* showing of infringement); *Fairbanks Capital Corp. v. Kenney*, 303 F. Supp. 2d 583, 590 (D. Md. 2003) (finding irreparable harm when the defendant was infringing a trademark). Furthermore, BBH has

presented evidence that, without a preliminary injunction, BBH will continue to suffer irreparable harm because Trans-Print's business model will inevitably lead to additional infringement.

Third, Plaintiff has presented evidence that the Defendants have misappropriated BBH trade secrets, such as a BBH customer list and proprietary SPG language, in violation of an agreement not to disclose such information. This type of harm is irreparable because "[a] trade secret once lost is, of course, lost forever." *FMC Corp v. Taiwan Tainan Giant Insdus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (*per curium*). Lastly, BBH has presented facts that certain of the Individual Defendants are competing with BBH in violation of covenants not to compete. *See Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 638-39 (D. Md. 1998) (determining that there was evidence of irreparable harm when employer sought to enforce a valid non-competition agreement).

The harm demonstrated by BBH in this case is neither remote nor speculative, but actual and imminent because BBH has shown that Trans-Print has obtained five customers who hold TransFormer licenses. *See Manning*, 119 F.3d at 263 (citing *Direx*, 952 F.2d at 812). BBH has demonstrated the potential of substantial harm if Defendants are not enjoined by a preliminary injunction. The TransFormer product, BBH's trade secrets, and its customer list are among the most valuable assets of the Company. If the Defendants were to continue to wrongfully use BBH's assets to compete with the Company, then the potential harm caused could be great.

B.     The Likelihood of Irreparable Harm to the Defendants if the Injunctive Relief is Granted

Plaintiff basically seeks to enjoin Defendants from providing support services for the TransFormer software. Such an injunction would create different degrees of harm to the various

Defendants.  First, the corporate defendant, Trans-Print, would suffer genuine harm because, to date, the majority of its business has related to the TransFormer software and activities that BBH seeks to enjoin.  However, Trans-Print's customer base is still small, with approximately five customers, and its business model is apparently still developing.  For example, Brooks testified that Trans-Print seeks to engage in general consulting related to the print and mail industry.  In addition, Brooks explained that Trans-Print is also working with other print-stream products, such as those offered by Group One. Therefore, the preliminary injunction sought by BBH would not necessarily shut-down Trans-Print's operations.  As a result, a preliminary injunction may in fact harm Trans-Print, but the harm would be lesser than the harm caused to BBH in the event that a preliminary injunction is not issued.

Second, Defendants Brooks, Andersen, Leutner, Nestor, and Meehling would suffer genuine harm if a preliminary injunction was issued because they would not be able to continue working for Trans-Print in the same capacities, if at all.  All of these Defendants have intimate knowledge and expertise relating to the TransFormer product, making it natural for them to support themselves and their families through the implementation of these skills.  However, these Defendants are obviously well-educated.  They are clearly knowledgeable about computer software in general as well as the mail and print-stream industry, separate and apart from only the TransFormer product.  Therefore, any harm would be somewhat diminished by their ability to find work that does not call into question their violation of various obligations to BBH.  *See generally Intelus Corp.,* 7 F. Supp. 2d at 638-40.

Lastly, Harris would likely suffer the least harm because he testified that he is not an employee of Trans-Print and has indicated that he is not interested in maintaining full time employment because he is basically retired.  Therefore, any harm caused by a preliminary injunction restricting his ability to

service the TransFormer product would be minimal.

Although both BBH and the Defendants have demonstrated that harm could result from the Court ruling against them on this preliminary injunction, BBH has shown that absent the issuance of injunctive relief it will likely suffer substantial harm recognized by both federal and state law.  The Plaintiff has shown that the alleged wrongs committed by Defendants would likely damage core aspects of BBH's business.  The Court finds that the substantial harm that BBH is likely to suffer substantially outweighs the harm of the Defendants and the balance of hardships squarely favors the Plaintiff.

II      Likelihood of Success of the Merits

Even though the Court need not make a final determination as to any of the legal claims presented by BBH, the Court must consider the arguments presented by the parties on these claims to determine the Plaintiff's likelihood of success.  *See Intelus Corp.,* 7 F. Supp. 2d at 640.  The Court must assess the parties' arguments in the context of the relevant law.  In conducting this analysis, the Court must address the Plaintiff's likelihood of success on the merits of its claims against each of the named Defendants.

     A.      <u>Claims Against Trans-Print</u>

        1.      <u>Trade Secrets</u>

When BBH purchased substantially all of THG's assets, it purchased all of THG's "know-how" and "trade secrets."  (*See* Agreement For Purchase and Sale of Assets, Ex. 2 to Am. Compl.)  BBH contends that Trans-Print is using trade secrets, such as BBH's customer list, TransFormer source code, and proprietary SPG language, to compete against BBH.  Through their employment with either THG, BBH or both, all of the Individual Defendants, who are now all associated in some way with

14

Trans-Print, had access to and were knowledgeable about certain of these alleged BBH trade secrets that Trans-Print is now allegedly misusing.

In exercising its jurisdiction, this Court applies Maryland law with respect to the Plaintiff's trade secrets allegations. Trade secrets are governed by the Maryland Uniform Trade Secrets Act (MUTSA). Md. Code Ann., Com. Law II § 11-201 *et seq.* "Trade secret" is defined as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> >
> > (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md. Code Ann., Com. Law II § 11-202(e).

"Although MUTSA statute preempts common law definitions of trade secrets, Maryland courts have continued to apply the Restatement of Torts's six-part test as 'helpful guidance' in determining the existence of a trade secret. *Bond v. Polycycle, Inc.*, 127 Md. App. 365, 372-73, 732 A.2d 970 (Md. Ct. Spec. App. 1999). The six factors are: (i) the extent to which the information is known outside of his [the employer's] business; (ii) the extent to which it is known by employees and others involved in his business; (iii) the extent of measures taken by him to guard the secrecy of the information; (iv) the value of the information to him and to his competitors; (v) the amount of effort or money expended by him in developing the information; and (vi) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.* at 371." *Home Paramount Pest Control Companies, Inc. v. FMC Corporation/Agricultural Products Group*, 107 F. Supp. 2d

15

684, 692 (D. Md. 2000).

Customer List

BBH has a list of substantially all of its customers, including contact information and service histories. This list is 267 pages in length and BBH maintains it electronically on a password protected BBH server, that is securely stored in BBH's Baltimore office. As a result, only BBH employees could access this customer list. BBH provided some customer names and customer contact information to the public in the normal course of marketing its products and services, but the list is not generally known to the public. The information maintained on the list would be valuable to a potential competitor, such as Trans-Print, because the list would provide customer contact information and show which customers no longer maintain a service and maintenance contract with BBH. This information would be difficult for anyone outside of BBH to duplicate.

It is undisputed that in May of 2004, Defendant Brooks, while still employed by BBH, sent this 267 page BBH customer list to Harris. Defendants, however, assert that this list was not used to solicit customers for Trans-Print. Brooks contends that he independently had contacts in the print and mail industry and that he used these contacts to solicit Trans-Print customers. Harris contends that he wanted the list to call old THG customers to discuss consulting services. BBH has presented evidence that Harris saved the list on his personal computer, that some modifications were made to the list, and that the file containing the list was renamed. Harris, however, deleted the list on October 23, 2004 before he turned over his computer to Plaintiff's forensic computer expert and Harris' use of "wiping" programs have made the deleted list unretrievable.

The Court finds that BBH has presented sufficient evidence showing a likelihood of success on

the merits based on the misappropriation of a BBH trade secret - the BBH customer list. BBH has demonstrated a strong likelihood that BBH derives independent economic value from the confidentiality of the customer list. *See* Md. Code Ann., Com. Law II § 11-202(e)(1). By maintaining the customer list on a secure BBH computer network, BBH has demonstrated that it took steps that appear to be "reasonable under the circumstances to maintain its secrecy." *See* Md. Code Ann., Com. Law II § 11-202(e)(2).

BBH's likelihood of success on the merits is bolstered by Harris' deletion of the customer list after the initiation of this litigation and after the TRO hearing before Judge Motz. One sanction for spoilation is for the court to impose upon a finding of spoliation of evidence an adverse inference instruction to the jury. *See Thompson v. United States HUD*, 219 F.R.D. 93, 100 (D. Md. 2003). Both the evidence presented by BBH along with the possibility of an adverse jury instruction related to the spoilation of evidence support a finding that BBH has demonstrated a sufficient likelihood of success on the merits based on this claim.

<u>Proprietary SPG Language</u>

It is undisputed that Trans-Print writes and modifies Statement Parameter Groups or SPGs as part of its business. SPGs are specific to the TransFormer product and are used by licenced users to customize the TransFormer software to meet customer needs. SPGs are instructions written for the TransFormer software, which are created using a propriety programming language. Only those who have worked for BBH or THG could know the SPG language and employees who know the SPG language are generally covered by a confidentiality agreement with BBH. BBH does offer classes in writing in the SPG language, but only to licensed users of the TransFormer who are also covered by a

17

confidentiality provision in the license agreement.  BBH spent over $5 million to purchase, among other things, the SPG proprietary language from THG.

Based on these facts presented by the Plaintiff, it has demonstrated a likelihood of success on the merits based on this claim.  BBH has demonstrated a strong likelihood that BBH derives independent economic value from the confidentiality of the SPG language.  *See* Md. Code Ann., Com. Law II § 11-202(e)(1).  Through the use of confidentiality agreements and by limiting the scope of the individuals who know how to use the SPG language, BBH has also demonstrated that it took steps that appear to be "reasonable under the circumstances to maintain its secrecy."  *See* Md. Code Ann., Com. Law II § 11-202(e)(2).

    2.   <u>Trademark</u>

BBH has a federally registered trademark for the name "TransFormer."  Under the Lanham Act individuals are generally prohibited from using registered trademarks without permission "in connection with the sale, offering for sale, distribution, or advertising of any goods or services."  15 U.S.C. § 1114(1)(a).  In addition, individuals may not use any term in connection with a good or service in a manner which is false or likely to cause confusion or mistake as to origin, affiliation or sponsorship.  15 U.S.C. § 1125(a).  Plaintiff contends that TransPrint's unauthorized use of the TransFormer mark in a August 18, 2004 Trans-Print Press Release infringed on its TransFormer trademark.

The August 18, 2004 Trans- Print press release, which is available on the Internet, uses the TransFormer name eleven times and makes the following statements:

    •    "Albert M. Harris, the original developer and owner of The Harris Group's printstream

parsing software The TransFormer ™, announced the formation of Trans-Print Software Services™ (TPS)."

- TransFormer "will initially offer third party contracted software maintenance and professional services support for the TransFormer™ software product."

- Harris is quoted in the press release as explaining "[w]e have the opportunity to fill a void left when licensed owners of The TransFormer™ allowed their high priced maintenance contracts to expire, and underutilized their software investment due to very high PSG [Programmer Services Group] fees."

BBH has presented sufficient evidence to show the likelihood that Trans-Print's press release caused, and could continue to cause, confusion in the market place. Defendants argue that their use of the TransFormer trademark is covered by the fair use defense under the Lanham Act. *See* 15 U.S.C. § 1115(b)(4) ("That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin."). Plaintiff alleges that this "fair use" defense is not available to Defendants, who must show that their use of the registered mark is not likely to cause confusion as to sponsorship or endorsement by the trademark owner. *See National Federation of the Blind, Inc v. Loopanics Enterprises, Inc.*, 936 F. Supp. 1232, 1240-41 (D. Md. 1996). At this stage in the litigation, the Defendants have not presented sufficient evidence that the fair use defense would be applicable in this case and, if applicable, meaningfully reduce the Plaintiff's likelihood of success on the merits. The Court finds, based on the results of the hardship balancing analysis above and the evidence presented by BBH related to its trademark infringement claim, that BBH has presented sufficient evidence to meet its burden of demonstrating that there is a likelihood of success on the merits of its trademark infringement claim.

19

3.    Copyright

To establish a *prima facie* case of infringement a plaintiff must establish:

1)    That the plaintiff owned a valid copyright to the work that was allegedly copied;

2)    That the defendant copied protected elements of that work; and

3)    That the work that the infringement plaintiff seeks to protect is sufficiently original.

*Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 361 (1991).  Once an

owner establishes a *prima facie* case for copyright infringement, courts generally presume that the

owner can show both probable likelihood of success on the merits and irreparable harm.  *See Service*

*& Training Inc. v. Data General Corp.*, 963 F.2d 680, 688-690 (4th Cir. 1992).

In this case, the parties obviously dispute the scope of the TransFormer copyright, which was

purchased from THG by BBH.  It is undisputed that the TransFormer copyright covers the

TransFormer products source code[1] and object code.[2]  *See Lotus Dev. Corp. v. Paperback*

*Software Int'l*, 740 F. Supp. 37, 45 (D. Mass. 1990) (noting that both source code and object code

are copyrightable if original) (internal citations omitted).  However, BBH contends that Statement

Parameter Groups or SPGs are covered by the TransFomer copyright along with the source code,

object code, and other computer programs.  Defendants, however, contend that SPGs are not

covered.  BBH contends that the creation and modification of SPGs, which is currently Trans-Print's

core business, infringes upon BBH's TransFormer copyright.

SPGs basically instruct the executable TransFormer software or the "TransFormer engine" on

---

[1]    Source code is program code in human readable form.

[2]    Object code is program code in computer readable form.

20

how to manipulate the print stream.  (Victor Tolomei Dep. at 108:11-109:6).  Since every print stream

is different, licensed TransFormer customers need instructions written in SPG to instruct the

TransFormer engine on how to manipulate the print stream.  (*See id*.)  Mr. Tolomei, BBH's Vice

President of Software Solutions, explained that "SPGs are, *in a sense* a SPG is a program" (Victor

Tolomei Dep. at 109:8-9) (emphasis added).  Mr. Tolomei went onto explain that the SPG language

took a "significant amount of effort to develop" and that "it's a very rich language, with many, many

instructions, many, many pieces of functionality to manipulate this print stream . . . ."  (Victor Tolomei

Dep. at 110:12-15.)

　　　　Although the TransFomer Software package includes a few sample or training SPGs, it is not

clear at this time whether these SPGs are copyrighted or even copyrightable.  Section 102(b) of the

Copyright Act of 1976 does not specifically list computer language as being excluded from copyright

protection.  *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of

authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or

discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such

work.").  However, just as the English language is not the proper subject of a copyright, computer

language may similarly be excluded from copyright protection.  The Court need not determine this issue

at this time because, at this stage, the very nature of the SPGs remains unclear and BBH has not

adequately shown that SPGs are covered by the TransFomer copyright.  In fact, BBH noted during the

hearing that there is currently a separate copyright application pending with the Copyright Office of the

United States relating to SPGs.  As a result, Plaintiff has not provided sufficient evidence, at this time, to

show that it owned a valid copyright for SGPs.  Therefore, based on this argument, the Court finds that

Plaintiff has not submitted sufficient evidence to demonstrate a likelihood of success on the merits based on its copyright infringement claim.

TransFormer Modification

Plaintiff also argues that any modification of a SPG creates a derivative of the TransFormer software.  Plaintiff contends that when Trans-Print implements new SPGs that it has written, it must compile the modified SPGs into the TransFormer software, which creates a modified version of the TransFormer software in violation of BBH's copyright for this software.  Although this may be the case, the Court finds that at this time Plaintiff has not submitted sufficient evidence to demonstrate that SPGs modify the copyrighted portions of the TransFormer product, notably its source code or object code. Therefore, based on this argument, Plaintiff, at this time, has not demonstrated sufficient likelihood of success on the merits.

The TransFormer License Agreement and Use of TransFormer Software by Trans-Print

Plaintiff asserts that Trans-Print has infringed on BBH's TransFormer copyright by copying and maintaining the TransFormer source code on its computers to service its clients.  Brooks stated that Trans-Print does not have the TransFormer source code.  In one instance, however, Brooks admitted to copying the TransFormer software onto a Trans-Print computer to service a customer, who was a BBH licensee.  He contends that, because the customer was a licensee and he signed a non-disclosure agreement with the client, that any limited copying of the TransFormer software to do SPG work for the client did not infringe on BBH's copyright.  For all other Trans-Print customers, Brooks either worked on site at the licensee's office or gained remote access to the licensee's computer system, and thus to the TransFormer software.

22

In general, BBH's TransFormer licence agreement, which was filed under seal, provides that any and all copies or modifications to the TransFormer software are part of the licensed product. Licensees must only use the product for their sole and exclusive benefit.  In addition, licensees are not allowed to let others use or have access to the TransFormer software without the prior written consent of BBH.  Licensees are clearly permitted to write their own SPGs and BBH even offers classes in "SPGing."  The issue here, however, is whether licensees can contract with third parties under a separate non-disclosure agreement to perform work related to the TransFormer product - work that is for the sole and exclusive benefit of the licensee - without the prior written consent of BBH.  There is no evidence that any Trans-Print customer has received written consent from BBH under the terms of the license.  The license agreement states in two separate provisions that prior written consent is required from BBH before anyone other than the licensee can use or have access to the TransFormer software.  Based on Brooks' testimony and the plain language of the license agreement, the Court finds that Plaintiff has provided sufficient evidence of likelihood of success on the merits of its copyright infringement claim based on this argument.[3]

<u>Copying of TransFormer Source Code</u>

Plaintiff's most straight forward argument is that Defendant Andersen wrongfully copied and possessed the TransFormer source code and, therefore, infringed on BBH's copyright because Andersen did not have a valid TransFormer license.  Plaintiff alleges that Andersen wrongfully copied the TransFormer source code from his BBH computer on July 21, 2004. (*See* CoreFacts Report at 2.)

---

[3]    The Court finds that, through this argument, Plaintiff has also demonstrated a likelihood of success on the merits for copyright infringement against Defendant Brooks.

The implication is that Andersen, who is now a Trans-Print employee, improperly copied the TransFormer source code for it to be used by Trans-Print. However, on July 21, 2004, Andersen was still a BBH employee and was not told until the next day, July 22, 2004, that he was going to be terminated by BBH as a part of a reduction in force. This fact combined with testimony from Andersen that all the files he accessed before leaving BBH were for projects he was working on and that he did, from time to time, work from home, call into doubt, at this stage, whether Andersen wrongfully copied the TransFormer source code. Therefore, at this time, the Court does not find that BBH has shown a likelihood of success on the merits of its copyright infringement claim based on this argument.

      B.    <u>Claims Against Individual Defendants</u>

          1.    <u>Covenants Not to Compete (Defendants Niels Andersen, Jeffrey Leutner, Richard Nestor, David Meehling)</u>[4]

BBH contends that certain of the Individual Defendants violated and continue to violate a valid covenant not to compete with BBH. Even though the Court need not make a final determination as to the covenants not to compete, the Court must consider the arguments presented by the parties to determine the Plaintiff's likelihood of success. *See Intelus Corp.*, 7 F. Supp. 2d at 640. The Court must assess the parties' arguments in the context of the relevant state law, and Maryland law governs the employment contracts for the majority of the Individual Defendants who have a non-compete clause in this case.[5]

---

[4]    Plaintiff does not contend that either Defendants Harris or Brooks have currently enforceable non-compete agreements with BBH.

[5]    Defendants Andersen, Leutner, and Nestor have all signed employment agreements that state that they are governed by the laws of the State of Maryland. Defendant Meehling's agreement states that it is governed by the laws of the State of North Carolina.

"The general rule in Maryland, as in most jurisdictions, that restrictive covenants in a contract of employment, by which an employee as a part of his agreement undertakes not to engage in a competing business or vocation with that of his employer on leaving the employment, will be sustained if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." *Ruhl v. F. A. Bartlett Tree Expert Co.*, 225 A.2d 288, 291 (Md. 1967) (internal citation and quotations omitted).  The Court of Appeals of Maryland has held that there is sufficient consideration for a covenant not to compete when the employer of an at-will employee consents not to terminate, or continues to employ, him or her for a substantial period of time.  *See Simko, Inc. et al v. Graymar Company*, 464 A.2d 1104, 1107 (Md. 1983).  Under Maryland law, restrictive employment covenants may be enforced "against those employees who provide unique services, or to prevent the future misuse of trade secrets[,] . . . [a] list of clients, or solicitation of customers."  *Becker v. Bailey*, 299 A.2d 835, 838 (Md. 1973).  Companies have a legitimate interest in preventing the loss of clients and the good will developed by a paid employee upon his or her departure.  *See Intelus Corp.,* 7 F. Supp. 2d at 639.

As a preliminary matter, before addressing each individual Defendant separately, the Court must determine whether there is sufficient evidence indicating that Trans-Print is competing with BBH.  Defendants contend that Trans-Print is not a direct competitor of BBH, but that it instead compliments BBH's business.  The Court finds that there is sufficient evidence that Trans-Print is competing with BBH.  In addition to the sale of TransFormer licences, BBH is also in the business of providing maintenance and professional services to support the software, which it provides through annual

Support and Maintenance Agreements ("SMA"). Trans-Print is basically seeking to provide a lower cost option. In its August 18, 2004 press release, Trans-Print states that it is trying to "fill a void" when licensed owners of the TransFormer no longer choose to renew their "high priced" SMAs with BBH. Trans-Print also explicitly states that it is going to offer "maintenance and professional services" for the TransFormer software, a service that is clearly offered by BBH. Therefore, based on the evidence presented to date, as employees of Trans-Print, the Individual Defendants listed below would be working for an organization that competes with BBH.

Niels Andersen

On November 5, 1997, Andersen signed an employment agreement with Bell & Howell, now BBH,[6] in which he agreed not to compete with BBH for one year upon the conclusion of his employment with them. (*See* Ex. 7 to Am. Compl.) More specifically, the agreement states:

> During the period of my employment and for a period of one (1) year thereafter ("Noncompetition Period"), I will not directly or indirectly engage as owner, director, officer, employee, agent or otherwise in any line of business with a Competing Organization in connection with any Competing Product of BH within the geographic area in which BH and the

---

[6]     The Individual Defendants contend that the employment agreements are *per se* unenforceable because the agreements were signed with the entity Bell & Howell Mail Processing Systems Company and not BBH. In support of this argument, the Individual Defendants cite *Reynolds and Reynolds Co. v. Hardee*, 932 F. Supp. 149, 151 (E.D. Va. 1996) for the proposition that covenants not to compete are not assignable. *Reynolds*, however, deals with an employment contract governed by Virginia law. In addition, the facts in *Reynolds* are markedly different because on the same day that the plaintiff purchased the assets of another corporation, which apparently included the defendant's employment agreement, the plaintiff terminated the defendant. Therefore, the defendant in *Reynolds* did not work for the plaintiff company after the acquisition. In addition, Plaintiff has explained that, although BBH has changed its name over time, the same legal entity has always been the party to the employment agreements at issue in this case.

Competing Organization actually compete.[7]

First, Andersen is the type of employee who is properly covered by a non-compete agreement because, as a developer and programmer at BBH, he provided unique services to the Company. Second, the one year restriction is reasonable in this case to protect the loss of clients and the good will developed by Andersen while employed at BBH. *See Padco Advisors, Inc. v. Omdahl* 179 F. Supp. 2d 600, 606 (D. Md. 2002) ("Maryland has consistently upheld two year limitations on employment with competitors as reasonable.") (citing *Gill v. Computer Equipment Corp.,* 292 A.2d 54, 59 (Md. 1972); *Tuttle v. Riggs-Warfield-Roloson, Inc.,* 246 A.2d 588, 589 (Md. 1968); *Ruhl,* 225 A.2d at 291). Third, although the geographic limitation does not specify certain city or states, it does limit the restriction to areas where BBH and the competing organization actually compete. *See Intelus Corp.,* 7 F. Supp. 2d at 642 (finding that the lack of a geographic limitation was not *per se* unenforceable when the covenant not to compete was limited to businesses that "compete directly for the same customers and accounts" as the plaintiff and the lack of a geographic limitation did not impose an undue hardship on the defendant). Fourth, there was sufficient consideration for the covenant not to compete because Andersen worked for BBH for approximately six and a half years. Lastly, Andersen is working for Trans-Print, a company, as discussed above, whose current business model directly competes with

---

[7] The agreement defines a "Competing Organization" as "a person or organization, including myself, who are engaged, or about to become engaged in research, development, production, distribution, marketing, providing services or selling a Competing Product. "Competing Product" means product, processes or services of any person or organization which are substantially the same, can be substituted for or applied to substantially the same use as the mail processing and print manipulation products, processes or services of BH [Bell & Howell] during the term of my employment with BH."

BBH in that it provides software maintenance and professional services support for BBH's TransFormer product.

Andersen argues that he was terminated by BBH and, therefore, enforcing his covenant not to compete is unfair and imposes an undue hardship on him.  Although Tolomei informed Andersen on July 22, 2004 that he would be terminated effective in two weeks, Tolomei contacted Andersen later that same day to inform him that he would not be terminated and was invited to stay on as a BBH employee.  When Andersen decided to leave BBH in early August, he would have had a job at BBH should he have decided to stay.  As a result, this Court does not find that Andersen was terminated by BBH.

In addition, as a knowledgeable and experienced developer and programmer the Court believes that Andersen will not be unduly harmed by the enforcement of BBH's covenant not to compete because he is capable of finding employment that would not violate this restriction.  *See Intelus Corp.,* 7 F. Supp. 2d at 639 (finding that, although the employee who was subject to a covenant not to compete may suffer some harm in having to seek alternative employment, the fact that it could take a while for the employee to find another appropriate job did not outweigh the potential harm to the plaintiff employer).  BBH has demonstrated that there is a likelihood of success on the merits because Andersen is competing with BBH while subject to an enforceable covenant not to compete. Therefore, based on the circumstances discussed above, the Court does not find that it would impose an undue hardship on Andersen to enforce his covenant not to compete with BBH in the form of preliminary injunctive relief.

Jeffrey Leutner

On November 10, 1997, Leutner signed an employment agreement with Bell & Howell, now BBH, containing the same one year restrictive covenant found in Andersen's agreement. (*See* Ex. 8 to Am. Compl.) Leutner worked in the professional services group at BBH and, therefore, had expertise in the preparation of SPGs. Leutner is the type of employee who is properly covered by a non-compete agreement because he provided unique services to BBH. Leutner chose to leave BBH effective September 29, 2004. He currently works for Trans-Print writing SPGs. The terms of the agreement are the same as those in the agreement between BBH and Andersen, which are described above. BBH has demonstrated that there is a likelihood of success on the merits because Leutner is competing with BBH while subject to an enforceable covenant not to compete. Therefore, for the reasons discussed above as to Andersen's non-compete agreement with BBH, the Court similarly does not find that it would impose an undue hardship on Leutner to enforce his covenant not to compete with BBH in the form of preliminary injunctive relief.

Richard Nestor

On November 6, 1997, Nestor signed an employment agreement with Bell & Howell, now BBH, containing the same one year restrictive covenant found in Andersen's and Leutner's agreements. (*See* Ex. 9 to Am. Compl.) On July 22, 2004, Nestor was told that BBH would be terminating his employment, effective in two weeks, on August 5, 2004. Nestor argues that he should not be subject to the non-compete agreement because he was terminated by BBH as a part of a reduction in force. Although there does not appear to be a clearly established rule in Maryland concerning the enforceability of non-compete agreements after the termination of an at-will employee without cause,

29

Defendants have cited *MacIntosh v. Brunswick Corp.*, 215 A.2d 222 (MD. 1965).

In *MacIntosh*, the Maryland Court of Appeals determined that certain post-employment restraints were unlawfully restrictive because they were basically unlimited and, therefore, over broad and unreasonable.  The Court also stated that "since the employee was discharged through no fault of his own to reduce the number of employees for the benefit of the employer and, as a result, the employee had been unemployed for more than two months because his previous training and experience had necessarily limited the type of work he could skillfully perform and be remmuneratively [sic] paid therefor, it is apparent that the duration of the restrictive covenant had the effect of imposing undue hardship on the employee."  *Id.*

Although the *MacIntosh* case discussed the undue hardship placed on the employee by the restrictive covenant after he was terminated, the case does not address the exact circumstances at issue in this case.  As the parties note, there is no controlling Maryland case on the precise question of whether a restrictive covenant is enforceable when an at-will employee is terminated without cause. The parties have cited competing state authority on this issue.

The view under New York law is that the termination of an at-will employee destroys the mutuality of obligation on which the covenant rests.  *See generally In re UFG Intern., Inc.*, 225 B.R. 51, 56 (Bankr. S.D.N.Y. 1998) (discussing that an at-will employee terminated without cause will not be subject to a covenant not to compete under New York law); *SIFCO Industries, Inc. v. Advanced Plating Technologies, Inc.*, 867 F. Supp. 155, 158 (S.D.N.Y. 1994) ("New York courts will not enforce a non-competition provision in an employment agreement where the former employee was involuntarily terminated.").  However, under Arizona, Indiana, and Connecticut law, courts have

enforced covenants not to compete when an employee was terminated. *See, e.g.*, *American Credit Bureau, Inc. v. Carter*, 462 P.2d 838, 841 (Ariz. Ct. App. 1969) ("The agreement prohibits competition whether the employee leaves or is fired, implying that the cause of termination does not affect the agreement."); *Gomez v. Chua Medical Corp.*, 510 N.E.2d 191, 195 (Ind. Ct. App. 1987) ("If the termination is made in bad faith, equity may be called upon to deny enforcement, but neither equity nor the law will deny enforcement upon the basis that the employer must establish that a discharge was made in good faith, or for good cause."); *Robert S. Weiss and Associates, Inc. v. Wiederlight*, 546 A.2d 216, 221 (Conn. 1988) ("the reasonableness of a restrictive covenant of employment does not turn on whether the employee subject to the covenant left his position voluntarily or was dismissed by the employer.")  As a matter of public policy, this Court believes that the position established under New York law should be adopted in this case.  The Court finds that it would not be equitable to impose an obligation upon Nestor not to compete under the terms of the restrictive covenant after BBH terminated his employment as a result of a reduction in force, with no wrongdoing or malfeasance on his part contributing to the termination.

<u>David Meehling</u>

On June 23, 1998, Meehling signed an employment agreement with Bell & Howell, now BBH, in which he agreed not to compete with BBH for one year after he no longer worked for BBH.  (*See* Ex. 10 to Am. Compl.)  Meehling is the type of employee who is properly covered by a non-compete agreement because he provided unique services to BBH.  Meehling chose to leave BBH effective October 15, 2004.  He currently works for Trans-Print.

The terms of Meehling's employment agreement are slightly different than those of Defendants

31

Andersen, Leutner, and Nestor and are governed by the laws of the State of North Carolina. Under

North Carolina law, "[t]o determine the validity of a covenant in a contract of employment providing

that, upon termination of the employment, the employee will not engage in competition with the

employer, it is necessary to apply these tests: (1) Is it founded on a valuable consideration? ... (2) Is it

reasonably necessary to protect the legitimate interest of the employer? ... (3) Is the limitation or

restriction reasonable as to time, ... and as to territory?" *Seaboard Industries, Inc. v. Blair*, 178

S.E.2d 781, 786-87 (N.C. Ct. App. 1971) (internal citations omitted). This test is very similar to the

Maryland standard discussed above.

      Meehling's covenant not to compete states that, for a period of one year following his

employment with BBH, he agrees not to "(a) engage in any business activity that competes with any

business activity of B&H in which Employee was engaged or of which Employee and [sic] knowledge

during Employee's tenure at B&H; or (b) use any Information to compete with B&H."[8] The Court is

satisfied that there is evidence that the employment agreement between Meehling and BBH is founded

on valuable consideration, that the agreement is reasonably necessary to protect BBH's interests, and

that the temporal restrictions in the non-compete covenant are reasonable.

      The geographic limitation on Meehling's non-compete agreement is "anywhere in the United

States " whereas, the other Individual Defendants, discussed above, were bound not to compete in any

geographic area where BBH and another organization actually compete. However, read in conjunction

---

[8]    "Information" is defined as "trade secrets, technical and proprietary information, relating
to B&H's methods, processes, apparatus, equipment, formulae, programs, financial data, business,
product and marketing plans and the like."

with provisions (a) and (b), the seemingly broad scope of the whole country is in fact limited.  Given the

nature of BBH's business -- providing mail processing software and services -- and evidence that BBH

has customers outside the greater Baltimore region, it is quite possible that Meehling and BBH could

engage in competition in various areas across the country.  For example, there is also evidence that

Trans-Print has customers that are located in different regions throughout the United States.  Read as a

whole, the covenant restricts Meehling from competing with BBH only in locations where BBH has an

established business.  Thus, the Court reads this covenant as being essentially similar to the other

Defendants' limits: "within the geographic area in which B&H and the Competing Organization *actually*

*compete*." (emphasis added).[9]

BBH has demonstrated that there is a likelihood of success on the merits because Meehling is

competing with BBH while subject to an enforceable covenant not to compete.  Given this

interpretation of the geographic limitation, the Court does not find that it would impose an undue

hardship on Meehling to enforce the covenant not to compete with BBH in the form of preliminary

injunctive relief.

    2.    <u>Non-Disclosure Agreements (All Individual Defendants)</u>

BBH argues that the Individual Defendants are misusing trade secrets and other confidential

and proprietary BBH information to compete directly with BBH.  "Once the employment relationship is

terminated, the employee may solicit his former employer's business absent an enforceable covenant

---

[9]    Meehling's covenant not to compete also states:  "If any court of competent jurisdiction
holds that the nature, geographic scope or duration of the restriction of Employee's activities hereunder
is unreasonably great, then the parties agree to be bound by the largest lesser restrictions as may be
reasonable, in such court's opinion."

restricting competition, misuse of trade secrets, or misuse of confidential information." *Allan M. Dworkin, D.D.S., P.A. v. Blumenthal*, 551 A.2d 947, 949 (Md. Ct. Spec. App. 1989) (citing *Maryland Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978)).  Here, all of the Individual Defendants have signed agreements with BBH containing covenants not to disclose confidential or proprietary BBH or THG information for the benefit of anyone other than BBH.  All of the Individual Defendants received valuable consideration in exchange for this restriction.  Defendant Harris received approximately $2.5 million when he sold THG to BBH and, in a contract signed November 5, 1997, agreed not to disclose confidential or proprietary BBH or THG information for the benefit of anyone other than BBH.  Defendant Brooks received approximately $500,000 from the sale of THG to BBH and, in a contract signed November 5, 1997, agreed not to disclose confidential or proprietary BBH or THG information for the benefit of anyone other than BBH.

     As discussed above, in consideration for their employment, the remaining defendants signed employment agreements with BBH that contained, not only a provision not to compete for a year after their separation from BBH, but also a provision stating that during the term of their employment and *thereafter*, they would not misappropriate or make available to anyone outside the Company any proprietary or confidential information, except as necessary in the performance of their jobs.  The agreements define proprietary and confidential information as "inventions, know-how, trade secrets, marketing and sales programs, customer and supplier information, financial data, pricing, manufacturing processes, computer software, product designs, and development plans."  (Ex. 7, 8, 9 to Am.

Compl.)[10]  The Court finds that BBH has presented sufficient evidence to show a likelihood of success on the merits, in that BBH has shown that all the Individual Defendants are associated with Trans-Print, whose principal business to date has been to service the TransFormer product mostly by writing SPGs. As discussed above, BBH has presented evidence that the proprietary SPG language is a trade secret of BBH.[11]  In addition, there is evidence that Brooks sent Harris BBH's 267 page customer list and service log, which is a BBH trade secret.

3.    <u>Trademark Infringement (Harris and Brooks)</u>

As discussed above, Trans-Print issued a press release on August 18, 2004 that used the trademarked name TransFormer eleven times.  Paul LeTourner, the Trans-Print employee handling public relations, apparently drafted the press release.  Harris testified that he authorized Trans-Print to use his name to help the Company get started and that he received the press release before it was issued, but he apparently did not review it.  Brooks, who is the principal of Trans-Print, testified that he also did not review the press release before it was issued.  Harris' name is prominently featured in the press release.  Brooks is also mentioned and, as stated above, is the principal of Trans-Print. Therefore, at this stage, Plaintiff has presented sufficient evidence to show likelihood of success on the merits against Harris and Brooks for trademark infringement.

---

[10]     As discussed above, Defendant Meehling's employment agreement is slightly different, although the substance of the confidential information prohibited from disclosure is essentially the same. (*See* Ex. 10 to Am. Compl.)

[11]     The Defendants have not presented any support that these non-disclosure agreements are somehow not enforceable because they are not limited in time or by geographic region.  Nor have Defendants Brooks or Nestor cited any case law supporting that this non-disclosure agreement is destroyed because BBH terminated their employment as part of a reduction of force.

4.    BBH Purchase of THG - Trade Secrets (Harris and Brooks)

As discussed above, when BBH purchased THG it paid over $5 million for the assets of THG,

which included various intellectual property rights, "know-how," and trade secrets.  As part of this

transaction, Harris received approximately $2.5 million and Brooks received approximately $500,000.

Plaintiff has presented sufficient evidence indicating a likelihood of success that these individuals are

wrongfully using possible BBH trade secrets, such as SPGs, to reconstitute a business that competes

with BBH.

C.    Claims Against All Defendants

It is undisputed that Defendants deleted files from computers in their possession after the

initiation of this lawsuit and after Judge Motz instructed the Defendants to deliver their computers to

Plaintiff's forensic computer expert, CoreFacts, for expedited discovery.

After the initiation of this lawsuit and after the Court's Order during the TRO hearing, the Individual

Defendants collectively deleted over 35,000 computer files beginning on the afternoon of October 22,

2004 until October 25, 2004, at which time their computers were provided to CoreFacts.  Although it

is impossible to determine precisely how many relevant files were destroyed, in large part because of

the use of wiping software and the execution of the de-frag function, approximately 9,044 of the deleted

files appeared to relate to the TransFormer software and/or BBH.

Defendants contend that the deleted information was largely personal in nature and largely

unrelated to this action.  As for the deletion of any BBH-related documents, Brooks testified that he

believed that this Court, through Judge Motz's October 22, 2004 Order, had somehow instructed him

to delete all BBH-related files from his computer prior to delivering it to CoreFacts.  After deleting files,

the Individual Defendants ran what is called "wiping" software, such as Secure Delete and Kremlin, on their computers and also used the de-frag program in an effort to ensure that none of the deleted files could be recovered. Within two hours of one another, on October 23, 2004, Defendants Harris and Brooks ran the program Secure Delete on their computers. On the same day, both used de-frag on their computers. In addition, Nestor ran the Secure Delete program on his computer the next day and Andersen ran the wiping program known as Kremlin.

Plaintiff argues that this document deletion and willful spoliation of evidence increases its likelihood of success on the merits of its claims because BBH is entitled to an adverse inference instruction to the jury. As noted by the Court in *Thompson v. U.S. HUD*, 219 F.R.D. 93 (D. Md. 2003), the court's issuance of an adverse jury instruction as a sanction should not be treated lightly. *See* 219 F.R.D. at 100. To show that an adverse inference instruction for spoliation of evidence is warranted, BBH must show three things: "(1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Id.*

The Court finds that BBH has demonstrated that the Defendants had control over their computers and had an obligation to preserve files that related in any way to BBH, because these files may have been relevant evidence in this case. In addition, the timing of the deletions and the use of wiping software may be evidence that the destruction was accompanied by a culpable state of mind. In

*Thompson*, the Court explained that there are three possible states of mind that can satisfy the culpability requirement:  bad faith/knowing destruction, gross negligence, and ordinary negligence.  *See id.* at 101 (citing *Residential Funding Corp. v. Degeorge Financial Corp*., 306 F.3d 99, 108 (2d Cir. 2002).  Defendants do not argue that they did not delete the files, but instead that they had good reason to delete them.[12]  The application of the third prong of this test is complicated by the fact that the Defendants used wiping software, which makes it difficult to know what evidence may have been destroyed.  However, there is evidence that over 9,000 deleted files appear to in some way relate to the TransFormer software or BBH.  Although the Court need not decide at this time whether an adverse inference instruction for spoliation of evidence instruction is warranted, BBH has presented strong evidence that there is a likelihood that such an instruction would be an appropriate sanction.  Although the Court has determined that BBH has not demonstrated a likelihood of success on the merits related to all of its arguments on all of its claims discussed above, the possibility of this sanction only serves to bolster BBH's likelihood of success on the merits for the claims for which BBH has made an adequate showing.

III    Public Interest

Finally, the application of the *Blackwelder* factors includes consideration of the public interest in determining whether to issue a preliminary injunction.  First, there is a public interest in enforcing restrictive covenants because they "can play an important role in the growth of the business that

---

[12]    Brooks, for example, explained that he thought Judge Motz ordered him to delete these materials during the TRO hearing.  Brooks, who was at the time, and still is, represented by able counsel, did not seek the advice of his attorney concerning his interpretation of the TRO proceeding before beginning to delete files.

depends upon the good will through effective customer service." *Intelus Corp.*, 7 F. Supp. 2d at 642

(citing *Ruhl*, 225 A.2d at 293). Second, Congress designed the Lanham Act to protect both

businesses and the public from the deceptive and misleading use of trademarks. *See Fairbanks*

*Capital Corp.*, 303 F. Supp. 2d 593. Similarly, Congress has also designed protection for copyrights.

As the United States Court of Appeals for the Third Circuit explained "[s]ince Congress has elected to

grant certain exclusive rights to the owner of a copyright, it is virtually axiomatic that the public interest

can only be served by upholding copyright protections[.]" *Apple Computer, Inc. v. Franklin*

*Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) (citations omitted). As a result, the public

interest factor weighs in favor of the Plaintiff.

<u>CONCLUSION</u>

For the foregoing reasons, after having conducted two days of hearing and after having

considering the factors outlined in *Blackwelder*, the Court grants, in part, Plaintiff's motion for a

preliminary injunction. BBH is entitled to preliminary injunctive relief enjoining: 1) Trans-Print, its

agents, and Brooks from reproducing, distributing, displaying, or creating derivatives of the BBH works

protected by copyright; 2) all Defendants from performing software maintenance or other services

concerning BBH's copyrighted TransFormer software; 3) all Defendants from retaining, using,

disclosing, or otherwise misappropriating any of BBH's trade secrets or other confidential or

proprietary information; 4) all Defendants from using BBH's TransFormer trademark; 5) all Defendants

from soliciting or accepting business relating to the TransFormer software from any customer of BBH;

6) Defendant Andersen from any employment with Trans-Print or any company that competes with

BBH for a period of one year from August 5, 2004 to August 5, 2005; 7) Defendant Leutner from any

39

employment with Trans-Print or any company that competes with BBH for a period of one year from September 30, 2004 to September 30, 2005; and 8) Defendant Meehling from any employment with Trans-Print or any company that competes with BBH for a period of one year from October 15, 2004 to October 15, 2005.  The Court is denying BBH's request to provide preliminary injunction relief to enforce Nestor's covenant not to compete.  The Court will issue a separate Order for Preliminary Injunction consistent with this Opinion.


December 2, 2004                              /s/_____

                                             Richard D. Bennett
                                             United States District Judge

40